JUDGE SEIBEL

# 13 CIV 6582

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

ARELENE TILLER,
                Plaintiff,

v.


XTREME AUTO SALES II, INC.,
HILLSIDE AUTO MALL, INC.,
ABED ATIYEH, and
RONALD M. BARON,


                Defendants.

------------------------------------------------------------

**COMPLAINT**

**AND JURY DEMAND**

## INTRODUCTION

1.      This is an action for money damages, injunctive relief, and declaratory judgment, brought by an individual consumer seeking redress for unlawful practices relating to an automobile transaction and setting forth Defendants' violations of the Truth In Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"), New York General Business Law § 350, New York State Usury Law, and setting forth common law claims for Fraud, and Rescission/Mistake.

2.      Plaintiff Arlene Tiller brings suit based on the illegal, unfair, abusive and deceptive practices employed by Defendants regarding an automobile purchase made on December 19, 2012.

## JURISDICTION AND VENUE

3.      Jurisdiction is based on 15 U.S.C. § 1640 and 28 U.S.C. § 1337.

1

4.     The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

5.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the property that is the subject of the action is situated in this District.

## THE PARTIES

7.     Plaintiff Arlene Tiller is a resident of Livingston Manor, New York.

8.     Defendant Xtreme Auto Sales II, Inc. ("Xtreme") is a domestic limited liability company under the laws of New York, whose principal place of business is located in Jamaica, New York in Queens County.

9.     Defendant Hillside Auto Mall, Inc. ("Hillside") is a corporation incorporated under the laws of New York, whose principal place of business is located in Jamaica, New York in Queens County.

10.    On information and belief, Xtreme and Hillside are united in interest in the same business venture and each entity will be collectively and interchangeably referred to hereafter as "the Dealership."

11.    At the time of Plaintiff's transaction Abed Atiyeh owned all or part of Xtreme Auto Sales II, Inc.

12.    Abed Atiyeh currently owns all or part of Xtreme Auto Sales II, Inc.

13.    Abed Aityeh's principal place of business is at Xtreme Auto Sales II, Inc. in Queens County.

2

14.     Abed Atiyeh currently determines the policies and procedures of Xtreme.

15.     At the time of Plaintiff's transaction, Abed Atiyeh was the primary decision maker and the prson who managed the day-to-day operations of Xtreme.

16.     Abed Atiyeh is the primary decision maker and the person who manages the day-to-day operations of Xtreme.

17.     Abed Atiyeh is currently the Principal officer or owner of Xtreme Auto Sales II, Inc.

18.     Upon information and belief, the interests of Abed Atiyeh and Xtreme are unified within the same business venture that is owned, managed, and/or controlled by Abed Atiyeh such that separate personalities of the business entity and the individual no longer exists, and if the acts of the entity were treated as those of the entity alone, an inequitable result will follow.

19.     At the time of Plaintiff's transaction, Ronald M. Baron owned all or part of Hilliside Auto Mall.

20.     Ronald M. Baron currently owns all or part of Hillside Auto Mall.

21.     Ronald M. Baron is a resident of Nassau County, whose primary place of business is at Hillside Auto Mall, in Queens County.

22.     At the time of Plaintiff's transaction, Ronald M. Baron was the primary decision maker and the person who managed the day-to-day operation of Hillside Auto Mall.

23.     Ronald M. Baron is currently the primary decision maker and the person who managed the day-to-day operations of Hillside Auto Mall.

24.     At the time of Plaintiff's transaction, Ronald M. Baron was the CEO of Hilliside Auto Mall.

25.     Ronald M. Baron is currently the CEO of Hillside Auto Mall.

26.     Upon information and belief, the interests of Ronald M. Baron and Hillside Auto Mall are unified within the same business venture that is owned, managed, and/or controlled by Ronald M. Baron such that separate personalities of the business entity and the individual no longer exists, and if the acts of the entity were treated as those of the entity alone, an inequitable result will follow.

## FACTS

27.     In December 2012, Plaintiff saw an advertisement on www.xtremeautosalesny.com for a 2011 Nissan Rogue sport utility vehicle ("the vehicle").  The advertisement offered the vehicle for sale for $11,984.

28.     Thereafter, Ms. Tiller made a credit application through the website.

29.     Plaintiff also called Xtreme in December 2012 to confirm the advertised price.  Plaintiff spoke with "Mike", an employee of the Dealership, who indeed confirmed that the vehicle price was $11,984.

30.     Mike also explained that there would be a $3000 finance charge on top of the vehicle sale price.

31.     Ms. Tiller also indicated in her online loan application, that she was unemployed.

32.     Over the phone Mike indicated that Plaintiff would need a co-signer on her loan due to her bad credit rating.

33.     Plaintiff's friend Gino Migliorini agreed to co-sign on financing for the vehicle.

34.     After calling the Dealership, Plaintiff, with Mr. Migliorini, drove to Extreme to purchase the vehicle on December 19, 2012.

35.     Once at Xtreme, Plaintiff spoke with the employee Mike, who again confirmed that the sale price of the vehicle was $11,984.

36.     Thereafter that day, Mike brought Plaintiff to the Dealership finance representative who introduced himself as "Mo."

37.     Plaintiff agreed with "Mo" to make a $1,000 down payment for the vehicle.

38.     In the course of their conversation, "Mo" induced Plaintiff to purchase what "Mo" described as a "5 year bumper to bumper" extended warranty, for an additional cost of $2000.

39.     "Mo" explained to Plaintiff that her financing payments would be $466 per month.

40.     Plaintiff inquired if she could get lower monthly payments and "Mo" further promised that the monthly payment could be reduced after Plaintiff made several payments and lowered the overall loan balance.

41.     Plaintiff and her friend Mr. Migliorini, were left to wait several hours after Plaintiff's initial conversation with "Mo".

42.     Both Plaintiff and Mr. Migliorini are in poor health.  Plaintiff is recovering from a severe heart attack and Mr. Migliorini is over 82 years old and has trouble walking, which required him to sit in his vehicle during the extended wait.

43.     After 7:00PM, when it was dark out, "Mo" finally brought documents to Mr. Migliorini's car to be signed by Plaintiff and Mr. Migliorini,

44.     In the car, "Mo" presented several documents and requested that both Plaintiff and Mr. Migliorini sign each document.

45.     Plaintiff reviewed each document as it was presented to her.

46.     Most of the documents presented had pre-printed boxes or lines that were left blank.

47.     "Mo" pointed to highlighted areas on all the documents that had signature lines for the buyer and co-signer and instructed Plaintiff to sign on the buyer line and Mr. Migliorini to sign on the co-signer lines in the highlighted areas.

48.     None of the documents presented to Plaintiff and Mr. Migliorini contained the total price of the transaction or the total amount financed.

49.     Plaintiff and Mr. Migliorini asked "Mo" for copies of all the documents presented and signed.

50.     "Mo" said that he would provide copies of all the documentation the next day when Plaintiff's daughter, Monica Perez Lopez was coming to pick up the purchased vehicle.

51.     As they had signed several documents and were not given any that provided a description of the amount financed or the total cost of the loan, Mr. Migliorini asked "Mo" to provide them with an explanation of the entire cost of the transaction, after all payments were made.

52.     "Mo" responded "$17,000."

53.     As Ms. Tiller agreed to pay $11,984 for the vehicle as advertised, and was previously told by "Mike" that there would be $3000 in finance charges and by "Mo" that she was purchasing a 5-year extended warranty for $2000, "Mo's" representation of the total cost, including all financing payments, made sense to Plaintiff and Mr. Migliorini.

54.     As it was almost 8:00pm and Plaintiff had to drive herself and Mr. Migliorini for over 3 hours back to Sullivan County, Plaintiff left and trusted that the dealership would provide the paperwork to her daughter the following day.

55.     The next day, December 20, 2012, Ms. Lopez went to the dealership to pick up the vehicle. She likewise requested the contract and all other documentation for the purchase, but

was told by the Dealership that the documents had not been prepared and that the dealership would mail them to the Plaintiff when they were ready.

56.     The dealership provided Ms. Lopez with the keys, however, and advised her to take the car to her mother, promising again to mail all documentation for the sale when it was ready.

57.     The Dealership never mailed any sale or loan documents to Plaintiff.

58.     Thereafter, Plaintiff received her first financing bill in January 2013, which stated the total balance on the loan was over $23,000 — twice the advertised and agreed to price of the vehicle.

59.     Plaintiff promptly called Santander Consumer USA ("Santander"), the assignee of the Retail Installment Contract (RIC) for the vehicle. An agent for Santander confirmed the dealership listed the price of the vehicle at over $22000 and the amount financed at over $23,000, with credit for the $1,000 down payment and including the $2,000 charge for the extended warranty.

60.     Santander also informed Plaintiff that despite "Mo's" and the Dealership's promises, her monthly payment would never be smaller than $466 per month, regardless of how many payments she made.

61.     Ms. Tiller requested that Santander send her a copy of all of the documents related to the sale of the vehicle.

62.     To date, Santander has only faxed Ms. Tiller a mostly illegible copy of the RIC, a copy of which is attached to the Complaint as Exhibit 1.

63.     Though it is difficult to read in most areas, the RIC clearly lists Defendant Hillside (not Defendant XTREME AUTO SALES II, INC.) as the seller of the vehicle.

64.     The interest, finance charges, amount financed, total amount of payments, and total cost of the vehicle, required to be disclosed on the face of the RIC under the Truth in Lending Act, are illegible.

65.     The cash price of the vehicle, though difficult to read clearly, appears to be over $22,000, or almost double the advertised and agreed to sale price of $11,984.

66.     The RIC also appears to list the $2000 charge for the extended warranty separately from the price of the vehicle in Section "J" of the itemized amounts.

67.     While the Truth In Lending Act Disclosures on the face of the RIC are not legible, they appear to include a pre-printed box that should ostensibly list some separate finance charges.

68.     Although the total amount of payments is not legibly disclosed on the face of the RIC, if Ms. Tiller continues to pay $466/month for the 72 month life of the loan, as indicated on the RIC, she will have paid $34,552 (including her $1000 deposit) for a vehicle that was advertised and confirmed at $11,984.

69.     Accordingly, under this scheme, Ms. Tiller has been obligated to pay $17,552 more than the $17,000 of total payments promised to her by "Mo" on the night of her purchase.

70.     Moreover, the RIC shows Mr. Migliorini's signature on the Buyer's line and Ms. Tiller's signature on the co-signer's line, despite the fact that in the car on the night of the transaction, "Mo" had Ms. Tiller sign all documents as the Buyer, and Mr. Migliorini sign as the co-signer.

71.     Plaintiff attempted to follow-up with the Dealership about its misrepresentations by calling Mike and "Mo" on several occasions in early 2013; however, she was merely shuffled between other Dealership employees who were unwilling to address the matter.

72.     In a phone call with a Dealership employee named "Mohammed," Ms. Tiller was told that the financed amount of over $23,000 quoted to her by Santander, included "a little interest."

73.     In another phone call to the Dealership, Plaintiff spoke with someone named "Abdul" who identified himself as a manager.

74.     Ms. Tiller's daughter, Ms. Lopez, was also a party to this phone call with "Abdul."

75.     During the call, "Abdul" finally confirmed that the difference between the advertisement price and the price of the vehicle listed on the RIC reflected finance charges. Abdul also made clear that the dealership was not willing to alter the transaction in any way and refused to assist Ms. Tiller with any refund or return of the vehicle.

76.     Ms. Tiller eventually filed a complaint with the New York City Department of Consumer Affairs.

77.     In a letter dated April 3, 2013, the Dealership responded to that complaint, again refusing to alter the transaction in anyway, and merely summing up Ms. Tiller's complaint as "buyer's remorse."

78.     In a letter dated July 31, 2013, Plaintiff's counsel again notified Defendants of Plaintiff's dispute and requested that the dealership cancel all contracts, take back the vehicle, and refund Ms. Tiller's payments on the vehicle.

79.     To date the dealership has not responded to the letter.

80.     At all relevant times Defendants acted willfully and in bad faith.

81.     The unlawful actions described herein harmed Plaintiff.

## COUNT I
## TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")

82.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

83.     Plaintiff's transaction as described herein was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

84.     Defendants are creditors within the meaning of TILA and Regulation Z.

85.     The increase in the cash price of the vehicle from the originally confirmed price of $11,984 is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

86.     The cash price increase of approximately $10,000 is attributable to charges that Plaintiff was required to pay incident to the extension of credit to Plaintiff, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

87.     As a result of Defendants' failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in Plaintiff's RIC are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

88.     Defendants have failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z.  e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

89.     As a result of Defendants' incomplete, inaccurate, and materially misstated disclosures, Plaintiff has suffered actual damages, including but not limited to the approximately $10,000 in extra charges illegally added to the sale price of the vehicle.

90.     Had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would not have agreed to purchase the vehicle on the terms and conditions imposed on her by the Defendants and instead would have sought to purchase a vehicle at a much lower total cost.

91.     Additionally, had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would have sought and obtained alternate, lower cost financing.

92.     For all these reasons, Defendants are liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees, litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

## COUNT II
## VIOLATION OF NEW YORK CIVIL USURY LAWS

93.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

94.     Pursuant to General Obligations Law § 5-501, the legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in §14-a of the Banking Law." Section 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum."

95.     The Dealership is not a "national banking association," and therefore is not exempt from state usury laws under 12 U.S.C. §85.

96.     The Dealership has obscured the actual rate of interest charged and the total amount financed by hiding additional interest as costs within the purchase.

97.     In reality, the increase in the cash price of the vehicle is a finance charge that should have been disclosed as such in the contract.

98.     When these charges are added to the incomplete finance charge, the total finance charge is actually more than $10,000 higher than reported, and the interest rate for this loan is well over 16%.

11

99.     Pursuant to NYGOL § 5-501, the alleged interest is therefore usurious, and the creditor forfeits both principal and interest due on the transaction.

100.    As a result of Defendants' violations, Plaintiff is entitled to a declaratory judgment that their obligation to Santander Consumer USA, the assignee of the loan made by the Dealership, is void, and are entitled to damages in the amount of all principal, interest, fees and other charges paid on the auto loan to date.

**COUNT III**
**FRAUD**

101.    Plaintiff re-alleges and incorporates by reference the foregoing paragraphs.

102.    Defendants intentionally and fraudulently induced Plaintiff to enter into a retail installment contract requiring Plaintiff to borrow at least approximately $10,000 more than was originally agreed with the false representation that the cost of the transaction, including all added purchases, and all finance charges, would be $17,000.

103.    As part of this fraudulent scheme, Defendants induced Plaintiff to sign documents that did not disclose the true cost of the vehicle or the true cost of financing and made false oral representations that the cash price of the vehicle is $11,984, that the finance charges are $3000, and that the total cost of the transaction, including all financing costs, is only $17,000.  After making these false oral representations, Defendants assigned loan documents to Santander Consumer USA, that list a cash price of over $22,000 for the vehicle that is nearly double the advertised and agreed to sale price.

104.    As an additional part of this fraudulent scheme, a Dealership employee falsely promised Ms. Tiller that she could reduce her monthly payments after making "a few" months of high

monthly payments of $466, when in fact the assignee of the RIC, Santander Consumer USA, would never allow the monthly payments to be reduced from $466.

105.    And as a further part of this fraudulent scheme, a Dealership employee falsely promised Ms. Tiller that she would receive a "5 year bumper to bumper" warranty or service contract for an additional charge of $2,000, though no such warranty or service contract has actually been provided to Plaintiff. In the alternative, although Ms. Tiller has been charged the  full price of $2000 for the warranty or service contract, she has not been provided with any documentation that would actually allow her to make use of that product.

106.    Plaintiff justifiably relied upon each of Defendants' misrepresentations of material facts, as a result of which she sustained losses and damages.

107.    Had Plaintiff not been misled by Defendants, she never would have agreed to a transaction obligating her to pay off a vehicle purchase cost that is approximately $10,000 higher than agreed and finance charges that are approximately $16,552 in excess of the $3,000 represented to Plaintiff during the transaction.

108.    Had Plaintiff not been misled by Defendants, she never would have agreed to a transaction that obligated her to make monthly payments of $466 for the 72 month life of the loan.

109.    And had Plaintiff not been misled by Defendants, she never would have agreed to purchase a warranty or service contract for $2,000.

110.    As a result of Plaintiff's reasonable reliance upon Defendants misrepresentations, Plaintiff has been damaged in an amount to be determined at trial and is entitled to actual damages,  including but not limited to $10,000 in overcharges for the  price of the vehicle, $2,000 charged for a non-existent and/or unavailable service contract, and the difference between

13

the finance charges as promised and the finance charges as required by Santander – approximately $16,552, punitive damages, attorneys fees, and costs and expenses.

## COUNT IV
## NYGBL § 350 (Unlawful False Advertising)

111.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

112.    Each of the acts and practices set forth above,  also constitute violations of NYGBL § 350,  which makes false advertising unlawful, independent of whether these acts and practices constitute violations of any other law.

113.    This false advertising was committed in the conduct of business, trade, commerce or the furnishing of a service in this state.

114.    Under NYGBL § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

115.    The vehicle was advertised on www.xtremeautosalesny.com for $11,984.  This online advertised price was confirmed once by Defendants once Plaintiff went to the dealership, and the advertisement and the confirmation are considered "advertising," as defined by NYGBL§ 350.

116.    Specifically, Defendants falsely advertised the vehicle's price because they hid the true cost to the consumer of purchasing the car. Defendants did so by increasing the sales price of the

14

vehicle from the amount advertised by adding finance charges to the cash price of the vehicle that were not disclosed to Plaintiff.

117.    Defendants' placing an online advertisement with a listed price of $11,984 followed by a false negotiation in which Defendants confirmed the advertised price and then increased the sale price without discussion or disclosure after consummation of the sale, represent the Defendants' false advertising.

118.    Defendants' false advertising was done knowingly and willfully and committed in bad faith.

119.    As a result of Defendants' false advertising in violation of NYGBL § 350, Plaintiff suffered actual damages including but not limited to the cost increase of approximately $10,000.

120.    For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350-e.

**COUNT V**
**RESCISSION/MISTAKE**

121.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

122.    As alleged herein (see Count of Fraud, *supra*) Defendants have committed fraudulent acts and made fraudulent representations to Plaintiff.

123.    Based on Defendants fraud and misrepresentations, Plaintiff's execution of the Retail Installment Contract is founded upon material mistake.

124.    As a result of Defendants' fraud and misrepresentations and Plaintiff's resulting material mistake, Plaintiff has sustained damages.  Specifically, Plaintiff was charged approximately $10,000 more for the price of the vehicle than was agreed to at the time of the transaction, and

has incurred a financial obligation to Santander that is approximately $16,552 higher than was disclosed orally at the time of the transaction, and has been charged $2,000 for a non-existent warranty or service contract, or in the alternative, has been charged $2,000 for a warranty or service contract that the Dealership has made it impossible to take advantage of as it refuses to provide any written disclosures for that product.

125.    Because Plaintiff has consistently sought to resolve this dispute and receive a refund of all charges that were not disclosed to her until after the sale, there can be no claim of laches.

126.    Plaintiff is ready, willing and able to restore the parties to the position each occupied prior to the execution of the subject agreements, providing that Defendants return all the money paid by Plaintiff in connection with this transaction and otherwise restore Plaintiff to the status quo ante.

127.    Plaintiff has no remedy at law.

128.    By reason of the foregoing, Plaintiff is entitled to a judgment rescinding and setting aside the Retail Installment Contract and Extended Warranty, and directing the return to her of all money paid in connection with this transaction.

WHEREFORE Plaintiff respectfully demands judgment against Defendants as follows:

a.   On COUNT I, TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA"), judgment against Defendants for statutory damages, actual damages, attorney's fees, litigation expenses and costs, declaratory judgment that they have violated TILA and Regulation Z, and such other or further relief as the Court deems appropriate;

b.   On COUNT II, VIOLATIONS OF NEW YORK CIVIL USURY LAWS, declaratory judgment that Plaintiff's obligation to Santander Consumer USA, the assignee of the loan made by Defendants, is void, actual damages in the amount of all principal, interest, fees, and charges paid and such other and further relief as the Court deems appropriate;

c.   On COUNT III, FRAUD, judgment against Defendants, actual damages, punitive damages, costs and reasonable attorneys fees;

16

d.  On COUNT IV, NYGBL § 350, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350(e), declaratory judgment that Defendants' have engaged in false advertising and such other or further relief as the Court deems appropriate;

e.  On COUNT V RESCISSION/MISTAKE, judgment rescinding and setting aside the Retail Installment Contract and service contract, and directing the return to Plaintiff of all money paid in connection with this transaction;

f.  Such other and further relief as law or equity may provide.


### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: September 17, 2013
       New York, New York

                                        Respectfully Submitted,

                                        _____
                                        Peter T. Lane, Esq.
                                        SCHLANGER & SCHLANGER, LLP
                                        *Attorneys for Plaintiff*
                                        9 East 40th Street, Suite 1300
                                        New York, NY 10016
                                        Ph:  914-946-1981, ext. 109
                                        peter.lane@schlangerlegal.com

EXHIBIT 1

RETAIL INSTALMENT CONTRACT
SIMPLE FINANCE CHARGE

Contract Number _____

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| GINO MIGLIORINI<br>ARLENE M TILLER<br>148 FOX MOUNTAIN RD<br>LIVINGSTON MANOR    NY   12758 | HILLSIDE AUTO MALL INC<br>150-01 HILLSIDE AVENUE<br>JAMAICA       NY   11432 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-in-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make | Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| U | 2011 | NISSAN | ROGUE S/SV/KROM | JN8AS5MT8BW168204 | ☐ Personal, family or household<br>☐ Business<br>☐ agricultural   ☐ ____ |

FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your down payment of $ _____ |
|---|---|---|---|---|

Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | 466.21 | Monthly beginning   02/28/2012 |
| Or At Follows: | | |

Late Charge. If payment is not received in full within ___ days after it is due, you will pay a late charge of $ ___ or ___ % of ...

Prepayment. If you pay off this loan early you will not have to pay a penalty.

Security Interest. You are giving a security interest in the vehicle being purchased.

Additional Information. See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds.

ITEMIZATION OF AMOUNT FINANCED

1 Cash Price (including $ ____ sales tax)

2 Total Downpayment =

...

Total Sale Price

RETAIL INSTALMENT CONTRACT:

Buyer Signs _____   Date _____   Co-Buyer Signs _____   Date _____

ORIGINAL LIENHOLDER

## OTHER IMPORTANT AGREEMENTS

### 1. FINANCE CHARGE AND PAYMENTS

a. How we will figure Finance Charge. We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b. How we will apply payments. We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c. How late payments or early payments change what you must pay. We based the Finance Charge, Total of Payments, and Total Sale Price on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. You may prepay. You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid Finance Charge and all other amounts due up to the date of your payment.

### 2. YOUR OTHER PROMISES TO US

a. If the vehicle is damaged, destroyed, or missing. You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

b. Using the vehicle. You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c. Security interest.
You give us a security interest in:
- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

d. Insurance you must have on the vehicle. You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e. What happens to returned insurance, maintenance, service, or other contract charges. If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

### 3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES

a. You may owe late charges. You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

b. If you pay late, we may also take the steps described below.

c. You may have to pay all you owe at once (Default). If you break your promises (default), we may demand that you pay all you owe on this contract at once subject to any right you have to reinstate the contract for loss (see below). Default means:
- You do not pay any payment on time;
- You start or a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you default.

d. You may have to pay collection costs. If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. The maximum attorney's fee you will pay will be 15% of the amount you owe.

e. We may take the vehicle from you. If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

f. How you can get the vehicle back if we take it. If we repossess the vehicle, you may have the right to get the vehicle back. If both things are true, we have the right to get the vehicle back by paying all past due payments, any late charges, and expenses not incurred related to retaking the vehicle, holding it, and preparing it for sale (expenses). First, you must have bought the vehicle primarily for personal, family, or household use. Second, your only default is a failure to pay an installment payment on time. Otherwise, we will tell you how much to pay to get the vehicle back. Your right to get the vehicle back when we ask it.

g. We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

h. What we may do about optional insurance, maintenance, service, or other contracts. This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

### 4. WARRANTIES SELLER DISCLAIMS

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide or limit any rights you may have under the Lemon Laws.

### 5. Used Car (Buyer) Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

### 6. Applicable Law

Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-NY 5/05